IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAMON ADONO, HERIBERTO AGUILAR, AND BENJAMIN CARO,<br><br>Plaintiffs<br><br>v.<br><br>WELLHAUSEN LANDSCAPE CO., INC., PROFIT SHARING PLAN AND TRUST, WELLHAUSEN LANDSCAPE CO., INC., AND JAMES A. WELLHAUSEN, Trustee<br><br>Defendants. | No. 01 C 8537<br><br>The Honorable William J. Hibbler |

## MEMORANDUM OPINION AND ORDER

Ramon Adono, Heriberto Aguilar, and Benjamin Caro sued their former employer, the Wellhausen Landscape Company, its profit sharing plan and trust, and the plan's trustee, James A. Wellhausen, alleging that the Defendants violated Sections 404(a)(1), 406(a), 406(b), 409(a), 412(a) and (b), 502(a)(1)(A) and (B), 502(a)(3)(A)(B), 502(c)(1)(A), and 502(c)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* After the parties conducted a bench trial before this Court, the Court, having heard and considered all the evidence, finds as follows:

### I. Findings of Fact

1. The Wellhausen Landscape Company ("the Company") was incorporated on July 29, 1983 under the laws of the State of Illinois. (Pl. Proposed Findings ¶ 1; Def. Proposed Findings ¶ 1).

2. In 1988, James A. Wellhausen, the president of the Company, learned that his stepfather, who had been involved in the company, had been embezzling money from the company. (Trial Transcript (Tr.) at 228).

1

3. As a result, Wellhausen spoke to an accountant who advised him to put money in a profit sharing plan to offset the tax burden caused by his stepfather's embezzlement, which had resulted in the Company underreporting its income. (Tr. at 229).

4. On July 29, 1990, the Company adopted a profit sharing plan known as the Wellhausen Landscape Company, Inc. Profit Sharing Plan and Trust ("the Plan"), with an effective date of August 1, 1989. (Pl. Trial Exhibit (Pl. Ex.) C; Tr. at 22-23, 35-36).

5. Wellhausen hired Frederic Hoffman, who worked for Associated Pension Services, Inc. (APS) to prepare the documentation for the Plan. (Tr. at 396-397).

6. Wellhausen served as trustee for the Plan. (Tr. at 397-398; Pl. Ex. D at 3).

7. The Company served as the Plan Administrator. (Tr. at 398; Pl. Ex. D at 2-3).

8. Throughout the operation of the Plan, Wellhausen was the President and sole Director of the Company. (Tr. at 241-244; Pl. Ex. G).

9. As the President, Wellhausen had sole discretion over whether the Company contributed to the Plan, how the funds shall be invested, and the day-to-day decisions of the Plan. (Tr. at 242; Pl. Ex. G).

10. The only corporate minutes kept by Wellhausen or the Company regarding any of the Plan's actions, including decisions to invest in the Plan or to fulfill any administrative duties necessary to maintain the Plan, were minutes reflecting the Company's decision to invest $30,000 in the Plan for the Plan year ending in July 1991. (Pl. Ex. G).

11. In July 1990, Wellhausen deposited $100 into a savings account at the Itasca Bank in the name of the Plan. (Tr. at 47; Pl. Ex. GG).

12. In April 1991, $30,000 was deposited into the Plan's Itasca Bank savings account. (Tr. at 400, 402; Pl. Ex. GG).

2

13. In October 1991, $30,000 was invested in the name of the Plan in various Fidelity Investment accounts. (Tr. at 400-02; Pl. Ex. HH).

14. No other contributions to the Plan were made. (Tr. at 239-243, 407).

15. According to the plan requirements, employees became vested after five years of service, excluding service prior to August 1, 1989 or service under the age of 21. One year of service for purposes of vesting required 1,000 hours of service during a Plan year. (Pl. Ex. C).

16. Wellhausen relied on the advice of accountants and other professionals (including Ken Kolnicki, Frederic Hoffman, and Ron Green) to take care of the administrative tasks and any legal filings, such as tax returns, for the Plan and the Company. (Tr. at 237, 269, 398-404).

17. Either Hoffman or Green served as a third-party administrator for the Plan at all relevant times. (Tr. at 398, 402-403).

18. Hoffman explained to Wellhausen the duties of Plan Administrator and provided Wellhausen with a Plan Administrator's guide that provides details of the Administrator's duties, so that Wellhausen could provide the guide to another third-party administrator if Hoffman was not available or if the Plan chose to retain another third-party administrator. (Tr. at 293-94; Pl. Ex. E).

19. Although Wellhausen was designated as Trustee, he never obtained a corporate surety bond, as required by 29 U.S.C. § 1112(a) and Article 9.7 of the Plan. (Tr. at 238; Pl. Ex. C at 63).

20. Heriberto Aguilar began working for the Company in 1984. (Tr. at 126).

21. Heriberto Aguilar was fired by Wellhausen in 1997. (Tr. at 123-126).

22. Benjamin Caro began working for the Company in 1989. (Tr. at 111).

23. Benjamin Caro was fired by Wellhausen in 1997. (Tr. at 111).

24. Ramon Adono worked for the Company from 1985 to 2000 (Tr. at 57-66).

25. Each of the Plaintiffs left the Company under acrimonious circumstances. Caro was

3

terminated while on vacation and accused by Wellhausen of stealing gas. Aguilar was terminated after a dispute with Wellhausen over his schedule. Adono quit after a dispute with Wellhausen over unpaid vacation pay. (Tr. 60-63, 79-80, 125-127, 431-434).

26. After leaving the Company, Adono lost trust in Wellhausen. (Tr. at 79-80).

27. In December 1991 or 1992, Wellhausen introduced Green to the Company's employees at a Company Christmas Party so that Green could explain the plan to the employees. (Tr. at 403).

28. Wellhausen and Green distributed a copy of the plan to the employees and a Certificate of Participation to those employees entitled to a share of the plan informing them of their share portion of the plan. (Tr. at 288-89, 403-06; Pl. Ex. D, JJ, KK, LL).

29. Wellhausen attempted to translate Green's explanation of the plan to Spanish, which is the native language of each of the named Plaintiffs as well as that of many of the Company's other employees at that time. (Tr. at 59, 404).

30. The Plaintiffs, whose native language was Spanish, did not fully understand the documents distributed by Wellhausen and Green, but made no immediate inquiries regarding the Plan. (Tr. 59, 76-78, 104, 116, 136-138).

31. By July 1991, Adono, Aguilar, and Caro were 100% vested in the Plan. (Pl. Ex. Z).

32. In 1992, the Company had a dispute with APS regarding services performed for the Plan and the amount owed to APS. (Tr. 307-308; Pl. Ex K).

33. APS refused to file the Plan Administrator's 1991 Form 550 C/R because of the dispute. (Tr. 307-308).

34. APS eventually filed the form in June 1992 after the dispute was resolved. (Tr. 307-308).

35. In 1992, the Company hired Clifton, Gunderson & Co. to replace APS in handling the Plan's administrative tasks. (Tr. 234-235, 402-403).

4

36. In May 1993, Wellhausen removed $30,000 of the Plan's assets from Itasca Bank by bank debit and deposited the funds in to the corporate account of the Company. (Tr. 428-430; Pl. Ex. GG).

37. In June 1993, Wellhausen deposited $30,500 from the Company's corporate account into the Plan's account at Itasca Bank. (Tr. 428-430; Pl. Ex. GG).

38. At some point in the 1995-1996 Plan year, more than two years after Wellhausen withdrew money from the Plan for a period of approximately forty days, all of the Plan's assets were invested into Oppenheimer Mutual funds. (Pl. Ex. NN).

39. The Court does not find credible Wellhausen's explanation that he withdrew the money in order to invest it in a more profitable vehicle than the savings account, but returned the money to the savings account after changing his mind. Wellhausen provided no explanation as to specific investments he was considering, why he withdrew the money before determining how he would invest it, and why he placed the withdrawn money in the Company's corporate account. (Tr. at 428-430).

40. Because Wellhausen failed to provide a credible explanation of why he withdrew the money, the Court finds that he withdrew the money for an improper purpose.

41. The Plan required the Plan Administrator to furnish documents to terminated employees regarding the amount of their vested interests. (Tr. at 431; Pl. Ex. C Art. 6.4; Pl. Ex. D at 8; Pl. Ex. E, Section IV).

42. Terminated employees were entitled to receive their vested interest after a one year break in service. (Pl. Ex. D at 8).

43. Neither Wellhausen, nor any other person acting on the Company's or the Plan's behalf, sent documents to Benjamin Caro, Heriberto Aguilar, or Ramon Adono after their terminations. (Tr.

at 431).

44. The Plan requires the Plan Administrator to furnish to each Participant on an annual basis a Summary Annual Report (SAR), which contains the value of the Plan assets as of the first and last day of the Plan Year. (Pl. Ex. E, Section V).

45. None of the named Plaintiffs received a SAR after 1992. (Tr. at 58-59, 115-117, 130).

46. Wellhausen could not identify whether the Plan filed Tax Returns from 1996 through 2000. (Tr. at 436-438).

47. On November 27, 2000, Adono sent by registered mail a request to Wellhausen to provide him with copies of all relevant information related to the Plan. (Pl. Sec. Amend. Compl. Ex. A).

48. The Court finds credible Sharilyn Moses', the Company's corporate secretary, testimony that the Company received Adono's November 27, 2000 letter. (Tr. at 332).

49. In 2002, Wellhausen retained E.R.I.S.A., Inc. to recreate the Plan Administrator's Census, full valuations, and allocations of the Company contributions, forfeitures and investment gain and loss. (Tr. at 473-479).

50. To conduct the audit, E.R.I.S.A., Inc. reviewed the Plan document and the Company's payroll records. (Tr. at 203). The Court finds E.R.I.S.A., Inc.'s reconstruction of the Plan to be reliable.

51. E.R.I.S.A., Inc. determined that every participant in the Plan as of 7/31/1994 was fully vested because there had not been substantial and recurring contributions to the Plan. (Tr. at 179).

52. Adono, Caro, and Aguilar were already fully vested by July 31, 1994. Only four Plan participants, collectively with Plan balances of less than $1,000, were not vested as of July 31, 1994. (Tr. at 199).

53. The Plan reached its maximum year-end balance at the end of the 1997-1998 Plan year. The balance then was 176,711.57. (Pl. Ex. NN).

54. As of the end of the 2003-2004 Plan 2004, the Plan balance was 143,168.63. (Def. Ex. A).

55. At the end of the 1997-1998 Plan Year, Aguilar's vested balance was $13,489.14 (Pl. Ex. NN).

56. At the end of the 1997-1998 Plan Year, Caro's vested balance was $5,840.13 (Pl. Ex. NN).

57. At the end of the 2000-2001 Plan Year, Adono's vested balance was $18,200.21 (Pl. Ex. NN).

## II. Conclusions of Law

1. The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, provides the basis for subject matter jurisdiction.

2. The Plan received a favorable determination from the IRS on August 13, 1991, indicating that the Plan conformed to the requirements of Internal Revenue Code Section 401(a).

3. James Wellhausen was a fiduciary with respect to the Plan because he served as the Plan's trustee and had sole discretion over the management of the Company and the Plan. 29 U.S.C. § 1002(21)(A).

4. Both Wellhausen and the Company are parties in interest within the meaning of that term as defined by 29 U.S.C. § 1004 (14).

5. 29 U.S.C. § 1132(a)(3) affords Adono, Aguilar, and Caro, as participants and beneficiaries of the Plan the right to bring a civil action to enjoin any practice that violates Subchapter I of ERISA or to obtain other appropriate equitable relief, to redress violations or to enforce any provision of

7

Subchapter I of ERISA.

6. 29 U.S.C. § 1106(a) prohibits a fiduciary from causing a plan to engage in a transaction that constitutes a direct or indirect "(B) lending of money or other extension of credit between the plan and a party in interest."

7. 29 U.S.C. § 1104 requires a fiduciary to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the prevailing circumstances that a prudent man acting in a like capacity and familiar with such matters would use.

8. 29 U.S.C. § 1109 imposes personal liability upon any fiduciary who breaches his responsibilities, obligations, or duties.

9. The Court concludes that on May 11, 1993, Wellhausen caused the Plan to transfer $30,000 of its assets to the account of the Company and that on June 19, 1993, Wellhausen caused the Company to return $30,500 to the Plan's accounts and that in doing so, Wellhausen caused the Plan to provide a loan to the Company for 39 days. The Court concludes that Wellhausen's actions violated 29 U.S.C. § 1106 and 29 U.S.C. § 1104.

10. Despite the fact that the Plan suffered no loss as a result of Wellhausen's actions, the Court concludes that Wellhausen breached his fiduciary duties when he withdrew $30,000 from the Plan's accounts and that he did so intentionally and for an improper purpose.

11. Wellhausen violated 29 U.S.C. § 1112(a) and Article 9.7 of the Plan by not obtaining a corporate surety bond. The Court concludes that this failure also caused Wellhausen to breach his fiduciary duties to the Plan.

12. The Company and Wellhausen failed to comply with 29 U.S.C. § 1132(c)(1)(B) when it failed to comply with Adono's November 27, 2000 request for information.

13. The Court concludes that Wellhausen functioned as a de facto Plan Administrator because: a) Wellhausen operated as President and Chairman of the Company; b) Wellhausen had sole discretion over whether the Company's decisionmaking process with regard to the Plan as well as the day-to-day decisions of the Plan; and c) Wellhausen failed to keep any minutes reflecting any of the Company's decisions with respect to the Plan.

14. The Court concludes that the Company and Wellhausen failed to discharge their duties as Plan Administrators with the care, skill, prudence, and diligence that a prudent person would use because they failed to maintain records of minutes regarding investment decisions, failed to file tax returns, failed to provide employees with SARs, and failed to provide terminated employees with documents regarding the amount of their vested interests.

15. The Court concludes that Wellhausen offered no explanation for the multiple failures of the Company to maintain adequate records and no explanation for the Company's failure to send terminated employees notice of their vested benefits and no explanation for the Company's failure to respond to Adono's November 27, 2000 inquiry regarding the Plan.

16. Consequently, the Court concludes that the lack of any reasonable explanation for Wellhausen's multiple breaches of fiduciary duties as well as his failure to provide any response to Adono's November 27, 2000 inquiry regarding the Plan warrants a finding of bad faith on the part of the Company and Wellhausen, such that a penalty of $10 per day, pursuant to 29 U.S.C. § 1132(c)(1)(B) from December 20, 2000 until September 28, 2005, (1744 days) or $17,440.

### III. Judgment

1. Wellhausen shall forfeit part of his vested interest in order to fulfill the penalty imposed by this Order.

2. Because Adono held the longest tenure with the Company, and because Adono mailed the

registered letter that resulted in the penalty under § 1132(c)(1)(B), 70 % of the penalty shall be added to Adono's vested interest. Because of their efforts in this litigation, 15% of the penalty shall be added to each of Caro's and Aguilar's vested interests.

3. Because no contributions have been made to the Plan since the year of its formation and because of the sporadic and haphazard recordkeeping of the Plan Administrator and because of the acrimonious relationship between Wellhausen and the former employees, there is no reason to amend the Plan, which is no longer qualified, and it should be terminated.

4. The assets of the Plan shall be transferred and held in trust for the benefit of the Plaintiffs and other beneficiaries who have valid claims for benefits arising from their employment by the Company.

5. The Court concludes that had the employees been provided with information as to their vested interest and their right to receive that interest upon termination that the employees would have exercised that right because of the acrimonious circumstances surrounding their departure from the Company. Consequently, for purposes of determining the amount each employee is entitled to recover from the resulting trust, the Court shall use their vested interest, as calculated by E.R.I.S.A., Inc., for the Plan-year ending immediately after their one-year break in service.

6. At the end of the 2000-2001 Plan year, Ramon Adono's vested balance was $18,200.21. Ramon Adono is therefore entitled to recover $18,200.21 plus $12,208 in penalties, or $30,408.21, from the resulting trust.

7. At the end of the 1997-1998 Plan year, Heriberto Aguilar's vested balance was $13,489.14. Heriberto Aguilar is therefore entitled to recover $13,489.14 plus $2,616 in penalties, or $16,105.14 from the resulting trust.

8. At the end of the 1997-1998 Plan year, Benjamin Caro's vested balance was $5,840.13.

Benjamin Caro is therefore entitled to recover $5,840.13 plus $2,616 in penalties, or $8,456.13 from the resulting trust.

9. The Plaintiffs are entitled to recover reasonable lawyers fees. Plaintiffs' fee petition shall be submitted to the Court on or before October 19, 2005. Defendants shall respond to the fee petition on or before November 7, 2005.

10. The trust shall remain in effect until September 30, 2006, at which time James Wellhausen is entitled to receive his vested interest from the remainder of the trust proceeds.

IT IS SO ORDERED.

9/28/05
Dated

Wm. J. Hibbler
The Honorable William J. Hibbler
United States District Court

11